UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

ANTHONY D. WIMSATT,

               Plaintiff,

    v.                                       CAUSE NO. 3:19-CV-462 DRL

ANDREW M. SAUL,
Commissioner of the Social Security
Administration,

               Defendant.

## OPINION & ORDER

Anthony D. Wimsatt appeals from the Social Security Commissioner's judgment denying his application for disability insurance under Title II and Title XVI of the Social Security Act, *see* 42 U.S.C. §§ 405(g), 1383(c)(3). Mr. Wimsatt requests remand of his claim for further consideration. Having reviewed the underlying record and the parties' arguments, the court denies Mr. Wimsatt's request for remand.

## BACKGROUND

Mr. Wimsatt suffers from a variety of physical impairments. Mr. Wimsatt has a high school education and has previous work experience as a pharmacy technician, a production line assembler, and an electronic tester [R. at 22, 352, 936]. Mr. Wimsatt suffers from the severe physical impairments of asthma, chronic obstructive pulmonary disease (COPD), arthritis, and degenerative disc disease at L5-S1 [R. at 928]. He suffers from the non-severe impairments of hypertension, migraine headaches, obstructive sleep apnea, diabetes mellitus, obesity, and depression [R. at 928-30].

Mr. Wimsatt filed a Title II application and a Title XVI application for benefits on February 12, 2013 and March 4, 2013, respectively [R. at 15]. These applications were denied initially on August 21, 2015 by Administrative Law Judge Joel Fina [R. at 23]. Mr. Wimsatt's appeal to the Appeal Council

was denied [R. at 1] and Mr. Wimsatt then appealed here [R. at 925]. Upon agreement of the parties, the case was remanded for further administrative proceedings [R. 1005-06].

On remand, his claims were heard again by Administrative Law Judge Kathleen Fischer on January 4, 2019 [R. at 925]. In a February 19, 2019 decision, the ALJ denied Mr. Wimsatt's petition on the basis that he could not show that he was disabled as defined by the Social Security Act [R. at 936]. The ALJ found that Mr. Wimsatt had the residual functional capacity (RFC) to perform a limited range of light work [R. at 931]. He could never climb ramps, stairs, ladders, ropes, and scaffolds and had to avoid unprotected heights [*Id.*]. Mr. Wimsatt could frequently balance and stoop, but could never kneel, crouch, or crawl [*Id.*]. He could occasionally reach overhead and could frequently reach in all directions bilaterally [*Id.*]. He could frequently push and pull and could continuously handle, finger, and feel [*Id.*]. He couldn't be exposed to fumes, odors, dusts, or other pulmonary irritants [*Id.*]. Mr. Wimsatt could occasionally work with moving mechanical parts and occasionally operate a motor vehicle [*Id.*]. That said, the ALJ found that Mr. Wimsatt's RFC didn't prevent him from performing his past relevant work experience, including his work as a pharmacy technician and as an electronic tester [R. at 936].

## STANDARD

The court has authority to review the decision under 42 U.S.C. § 405(g); however, review is bound by a strict standard. Because Mr. Wimsatt did not file exceptions and the Appeals Council did not otherwise assume jurisdiction, the court evaluates the ALJ's decision as the Commissioner's final word. *See* 20 C.F.R. § 404.984; *see also Murphy v. Berryhill*, 727 F. Appx. 202, 206 (7th Cir. 2018) (the ALJ's decision is final if the claimant skips the Appeals Council after remand).

The ALJ's findings, if supported by substantial evidence, are conclusive and nonreviewable. *See Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence is that evidence which "a reasonable mind might accept as adequate to support a conclusions," *Richardson v. Perales*, 402 U.S.

389, 401 (1971), and may well be less than a preponderance of the evidence, *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Richardson*, 402 U.S. at 401). If the ALJ has relied on reasonable evidence and built an "accurate and logical bridge from the evidence to conclusion," the decision must stand. *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). Even if "reasonable minds could differ" concerning the ALJ's decision, the court must affirm if the decision has adequate support. *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)).

DISCUSSION

When considering a claimant's eligibility for disability benefits, an ALJ must apply the standard five-step analysis: (1) is the claimant currently employed; (2) is the claimant's impairment or combination of impairments severe; (3) do his impairments meet or exceed any of the specific impairments listed that the Secretary acknowledges to be so severe as to be conclusively disabling; (4) if the impairment has not been listed as conclusively disabling, given the claimant's residual function capacity, is the claimant unable to perform his former occupation; (5) is the claimant unable to perform any other work in the national economy given his age, education, and work experience. 20 C.F.R. § 404.1520; *Young v. Secretary of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). The claimant bears the burden of proof until step five, where the burden shifts to the Commissioner to prove that the claimant can perform other work in the economy. *See Young*, 957 F.2d at 389.

Mr. Wimsatt challenges the ALJ's conclusions that he is not totally disabled. Mr. Wimsatt asserts that (1) the ALJ erred at step three in determining that his asthma did not meet or equal Listing 3.02, and (2) the ALJ erred in weighing medical opinion evidence by dismissing the opinions of two of his treating physicians. The court disagrees and affirms.

A.     *Mr. Wimsatt's Impairment Didn't Meet or Equal Listing 3.02, so the ALJ Didn't Err.*

At step three of the analysis, an ALJ must determine whether the claimant meets or equals any of the listed impairments found in the Listing of Impairments. *See* 20 C.F.R. pt. 404, Subpt. P, App. 1; 20 C.F.R. § 404.1520(a)(4)(iii). At this step, the ALJ found that Mr. Wimsatt's impairments didn't meet the listing levels of 1.02 (major dysfunction of a joint), 1.04 (disorders of the back), 3.02 (chronic respiratory disorders), and 3.03 (asthma). Mr. Wimsatt focuses his appeal on the ALJ's finding that his asthma impairment didn't meet or equal listing 3.02.

To meet listing 3.02, Mr. Wimsatt, a male whose height measures approximately 68 inches without shoes, would need to have one of the following: (1) an FEV1 (forced expiratory volume) less than or equal to 1.60, (2) an FVC (forced vital capacity) less than or equal to 2.00, (3) a test, such as a DLCO (meaning diffusing capacity of the lungs for carbon monoxide), demonstrating chronic impairment of gas exchange, or (4) exacerbations or complications that required at least three hospitalizations for at least forty-eight hours, within a twelve month period, at least thirty days apart. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.02. Mr. Wimsatt's appeal focuses on his FEV1 and FVC tests.

Spirometry tests are used to measure how well the claimant moves air into and out of his lungs. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § (3.0)(E)(1). The test provides FEV1 and FVC measurements. FEV1 measures the "forced expiratory volume in the first second of a forced expiratory maneuver." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.00(C)(10). FVC measures the total volume of air that is exhaled during the entire forced expiratory maneuver. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.00(E)(1). The listing has specific requirements for spirometry reports. For example, the report must include "any factors, if applicable, that can affect the interpretation of the test results (for example, your cooperation or effort in doing the test.)." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.00(E)(3)(b).

Mr. Wimsatt has undergone several spirometry tests over the years. When reviewing the results of these examinations, the listing uses the highest post-bronchodilator result from each test to assess the severity of the claimant's respiratory impairment. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.02(A); *see also Eskew v. Astrue*, 462 F. Appx. 613, 615 (7th Cir. 2011). In June 2011, his highest post-bronchodilator FEV1 score was 2.00[1] [R. 547]. In October 2012, his highest post-bronchodilator FEV1 score was .93 and his highest FVC score was 1.60 [R. 571]. The 2012 report indicated that, though he cooperated fully and used good effort, Mr. Wimsatt was wheezing and coughing during the test, he was fidgety throughout the test, and couldn't sit still for long periods of time [R. 570]. In April 2013, another spirometry test reported the highest post-bronchodilator scores as FEV1 at 1.66 and FVC at 2.46 [R. 653]. Finally, in January 2015, a spirometry report listed his highest post-bronchodilator scores as FEV1 at 2.16 and FVC at 3.81 [R. 824].

Dr. James McKenna, a medical expert retained by the Commission, responded to an interrogatory from ALJ Fina in the original proceeding and opined that Mr. Wimsatt didn't meet or equal a listing. Dr. McKenna discounted the October 2012 scores as errant because Mr. Wimsatt was wheezing during the examination, indicating an asthma exacerbation [R. 830]. Dr. Lee Fischer, another medical expert, also testified at the administrative hearing that Mr. Wimsatt didn't meet or equal a listing, including 3.02. Dr. Fischer also discounted the October 2012 results as a likely asthma exacerbation and otherwise found Mr. Wimsatt's results to be too inconsistent to meet the listing [R. 965-66].

The ALJ noted the opinions of Drs. McKenna and Fischer when finding Mr. Wimsatt didn't meet a listed impairment. [R. 930-31]. Based on a testing note, the ALJ herself doubted the validity of the October 2012 results because Mr. Wimsatt could not sit still during the test [R. 931]. The ALJ also noted that Mr. Wimsatt's October 2012 FEV1 scores were lower than 70 percent of his predicted

---

[1] There are no FVC scores reported from this examination.

normal value; she therefore concluded that repeat testing was required. *Id.* Finally, she noted that the April 2013 results FEV1 score of 1.66 was above the listing level. *Id.*

Mr. Wimsatt contests the ALJ's rejection of his October 2012 spirometry test. Specifically, Mr. Wimsatt says (1) the ALJ played doctor by interpreting the October 2012 note that Mr. Wimsatt was fidgety; (2) the ALJ misinterpreted the retesting requirement under Listing 3.00(E)(2)(b); and (3) the ALJ performed a perfunctory analysis of the listing when she didn't discuss his October 2012 FVC results.

An ALJ should be specific in her analysis and name the subsections of 3.02 that she considers.[2] *See Jeske v. Saul,* 955 F.3d 583, 588 (7th Cir. 2020); *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (remand may be required if an ALJ doesn't discuss a listing by name and combines omission with a perfunctory analysis of the listing). Still, here, the ALJ named listing 3.02 and discussed the substantial evidence supporting her decision it did not apply, including medical opinion.

First a couple concerns, however. It would seem to be of no moment that a person fidgeting or more active than sitting quietly might skew the measurement of someone's pulse rate, perhaps even a patient's blood pressure, as examples. An educated layperson might well appreciate that. Certainly an ALJ tasked with weighing medical evidence would too. To what extent fidgeting would throw the numbers would require more medical insight. The same would be true of a spirometry test. That the ALJ relied on the fact of Mr. Wimsatt's fidgeting during his 2012 spirometry tests as a reason to so skew the results as to be unreliable or less worthy of weight raises some concern here. *See, e.g.*, *Akin v. Berryhill*, 887 F.3d 314, 317-18 (7th Cir. 2018) (finding the ALJ "played doctor" when he opined that MRI results were "consistent" with complainant's impairments without expert opinion); *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) (ALJ "played doctor" when ALJ relied on claimant's "unremarkable"

---

[2] Mr. Wimsatt only complains the ALJ didn't specifically name subsection (B) and not (A).

MRI results as inconsistent with her complaint of migraines). Though both doctors discounted the 2012 test results as an asthma exacerbation, neither cited Mr. Wimsatt's fidgetiness as a reason why.[3]

The ALJ also seemed to discount the 2012 test results "as well" [R. 931] because she believed the listing required repeat testing. Mr. Wimsatt's FEV1 was less than 70 percent of his predicted normal value. The ALJ was right as an interpretative matter of course. The listing states: "if your FEV[1] is less than 70 percent of your predicted normal value, we require repeat spirometry after inhalation of a bronchodilator to evaluate your respiratory disorder under these listings, unless it is medically contraindicated." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.00(E)(2)(b). But that is precisely what occurred at the October 2012 examination—Mr. Wimsatt's original FEV1 scored below 70 percent of his predicted normal value, so he was administered a bronchodilator and reproduced a score still below 70 percent of his predicted value [R. 571]. With that repeat testing done, that would seem then no reason to discount this result.

Despite these deficiencies, and in addition to the credited medical opinion that discounted the 2012 results, the ALJ's opinion stands because Mr. Wimsatt's impairment doesn't meet the durational requirement. Mr. Wimsatt argues that the plain reading of listing 3.02 shows that a pulmonary function testing at listing levels is expected to last at that level for the duration period. But this argument ignores 20 C.F.R. § 404.1525(c)(4), which states that, unless a listing states a specific period of time for which an impairment must meet the listing, "the evidence must show that [the claimant's] impairment(s) has lasted or can be expected to last for a continuous period of at least 12 months." *See also* 20 C.F.R. §§ 404.1509, 404.1520(d). The evidence doesn't support that Mr. Wimsatt's FEV1 or FVC scores met

---

[3] Dr. Fischer did not testify as to his reasoning behind the supposed asthma exacerbation; however, Dr. McKenna pointed to Mr. Wimsatt's wheezing during the test. According to the listing, wheezing *by itself* does not indicate a patient is medically unstable during a test. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.00(E)(2)(iii). To whatever extent Dr. McKenna's sole reliance on wheezing may undercut his opinion, Mr. Wimsatt hasn't shown that Dr. Fischer relied solely on that factor when evaluating the October 2012 report. There is otherwise no reason to doubt Dr. Fischer's comprehensive review and opinion of the October 2012 report.

listing levels for a continuous period of 12 months, so his impairments don't meet listings 3.02(A) or (B). The October 2012 report is the only pulmonary function test in the record showing listing levels of FEV1 or FVC and another test six months later (April 2013) shows values that aren't presumptively disabling. His values only increase at later testing (January 2015) [R. 824].

The ALJ noted Mr. Wimsatt's April 2013 pulmonary function test, specifically noting that his FEV1 score was above levels listed in 3.02(A). Though the ALJ didn't specifically note Mr. Wimsatt's FVC scores from the same report, those were also above levels listed in 3.02(B). The ALJ's decision that Mr. Wimsatt didn't satisfy his burden in explaining his impairment met or equaled listing 3.02 is supported by substantial evidence and a logical bridge between the evidence and her conclusion. *See Thomas*, 745 F.3d at 806.

In a last attempt to establish disability at step three, Mr. Wimsatt attacks the reliability of Dr. Fischer's testimony, on which the ALJ relied. But these contentions are either misplaced or immaterial. He argues Dr. Fischer only reviewed two medical opinions in the record, those of Drs. Maskiny and McKenna; however, review of the testimony shows that those are the only two opinions that Dr. Fischer disagreed with in part [R. 963-64]. Mr. Wimsatt further contends Dr. Fischer conceded that the FEV1 values from April 2013 would meet listing levels; but that testimony was premised on a listing level of 1.75 instead of 1.60. Based on Mr. Wimsatt's reported height at the April 2013 examination [R. 653], the appropriate listing level is 1.60 and his score of 1.66 is above that qualifying for a presumptive disability. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.02(A).

B.    *The ALJ Didn't Err in Weighing Medical Opinion Evidence.*

Mr. Wimsatt argues the ALJ erred in assigning little weight to his treating physicians' opinions that he needed frequent time off at work and would miss several days of work per month. Because Mr. Wimsatt's claim was filed before March 27, 2017, the weight of medical opinions is evaluated under 20 C.F.R. § 404.1527. The treating physician rule directs an ALJ to give controlling weight to

the medical opinion of a treating physician if it is "well-supported by medically acceptable and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). If there is contradictory evidence, the ALJ must consider several factors, including: (1) the examining relationship; (2) the treatment relationship (including the length of treatment and frequency of examination and the nature and extent of the treatment relationship), (3) the supportability of the opinion; (4) the consistency of the opinion with the record as a whole; (5) the treating physician's specialization; and (6) other factors that either support or contradict the medical opinion. 20 C.F.R. § 404.1527(c). Mr. Wimsatt argues that the ALJ failed to consider multiple factors in reviewing the opinions of two of his treating specialists.

Mr. Wimsatt points to Dr. Linus Akamangwa, his primary care physician doctor, and Dr. Charbel Maskiny, his pulmonologist. Their opinions concerned physical RFC assessments, detailing what work Mr. Wimsatt is capable of performing [R. 813-17, 1504-08]. What both parties seem to miss in their briefing is that the treating physician rule doesn't apply to RFC determinations by physicians. *See Bates v. Colvin*, 736 F.3d 1093, 1100 n.4 (7th Cir. 2013) ("the extent of what a claimant can do despite [his] limitations is committed to the exclusive discretion of the ALJ"); *Misener v. Astrue*, 926 F. Supp.2d 1016, 1031 (N.D. Ind. 2013) (DeGuilio, J.) (finding no error in the ALJ's decision to assign low weight to a treating physician's RFC assessment); *see also* 20 C.F.R. §§ 404.1527(d)(2, 3) (the ALJ will not give any "special significance" to the source of an opinion on issues reserved to the Commissioner, *e.g.*, a claimant's residual functional capacity). That said, though an RFC assessment isn't an opinion deserving controlling weight, an ALJ cannot just ignore the physician's opinion about a claimant's ability to work. *See Bates*, 736 F.3d at 1100 n.4 (citing *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013)).

Mr. Wimsatt argues that the ALJ didn't provide good reason for giving little weight to the more limiting opinions from Drs. Akamangwa and Maskiny. Dr. Akamangwa opined that Mr. Wimsatt

could perform "less than sedentary work and needed to take breaks once an hour for 10-15 minutes" [R. at 935]. He further noted that Mr. Wimsatt would be absent from work more than four days within a month [R. at 935]. Dr. Maskiny opined in November 2018 that Mr. Wimsatt could stand more than two hours but could only walk less than two hours [R. at 935]. Additionally, he noted that Mr. Wimsatt would require fifteen to thirty-minute breaks and would be absent from work for more than three days within a month.

The ALJ gave these opinions little weight, finding that the opinions were inconsistent with the medical record [R. 935]. In giving these opinions little weight, the ALJ noted "that the claimant does not require breaks and would not miss work, as he had improvement in his breathing with treatment" [R. at 935]. The ALJ also noted that "the claimant also had normal clinical findings, including intact strength and gait" [R. at 935]. The ALJ may not have expressly listed the factors enumerated in 20 C.F.R. § 404.1527, but she did discuss, in great detail, Mr. Wimsatt's treatment history with both physicians, which includes the nature and extent of the treating relationships [R. 932-936]. She specifically noted Dr. Maskiny's specialty, pulmonology [R. 933].

She also discussed the supportability of the opinions and their consistency with the record as a whole. *See* 20 C.F.R. § 404.1527(c). The ALJ cited exhibits within the record demonstrating why she found the treating physicians' opinions inconsistent with Mr. Wimsatt's medical record. Mr. Wimsatt argues that some of these exhibits support, rather than undermine, a more disabling RFC. The ALJ listed exhibits, in chronological order, showing Mr. Wimsatt's history of treatment for his asthma and COPD. The earliest of those exhibits do show Mr. Wimsatt at his worst—he was admitted to the hospital for an episode [R. 462] and subsequently improving on medication, but not under control [R. 484]. The later exhibits cited by the ALJ show Mr. Wimsatt's breathing problems (including his asthma and COPD) becoming more controllable with increased medicine compliance, at times being described as manageable or controlled [R. 483-84, 847-50, 857, 862, 865]. In her earlier recitation of

10

Mr. Wimsatt's medical history, the ALJ noted documented flair ups in his condition in 2016 through 2017, resulting in a hospital visit in August 2017, when he was around irritants [R. 1401] or after his insurance stopped paying for his medications [R. 1223, 1396]. His symptoms seemed to stabilize again by the end of 2017 through 2018, experiencing some good days and some bad [R. 1377-79, 1456-62].

The court is convinced that the ALJ evaluated the RFC assessments using the factors enumerated in 20 C.F.R. § 404.1527 and explicitly considered their consistency with the record as a whole. *See Brown v. Astrue*, 2011 U.S. Dist. LEXIS 124141, 36-37 (N.D. Ind. Oct. 27, 2011) (Cosbey, J.) (finding it enough for the ALJ to generally cover the factors so long as she provides "good reasons" for the weight assigned); *see also Brown v. Barnhart*, 298 F. Supp.2d 773, 792 (E.D. Wis. 2004) ("ALJs are not required to produce prolix opinions containing checklists from all of the regulations," rather, the ALJ must sufficiently articulate her assessment of the evidence that enables the court to "trace the path of her reasoning"). While reasonable minds might differ on the weight of the evidence, the ALJ articulated good reasons for the weight she assigned the treating physicians' RFC assessments based on substantial evidence, especially when they are not entitled to any special deference based solely on their source. *See Simila*, 573 F.3d at 513; *Misener*, 926 F. Supp.2d at 1032; *see also* 20 C.F.R. §§ 404.1527(d)(2, 3). Remand is not required in such a situation.

CONCLUSION

The court finds that the ALJ's decision to assign little weight to Mr. Wimsatt's treating physicians and finding that Mr. Wimsatt's impairments do not meet or equal Listing 3.02 are supported by substantial evidence. The court accordingly DENIES Mr. Wimsatt's request for remand.

SO ORDERED.

September 4, 2020                          *s/ Damon R. Leichty*
                                          Judge, United States District Court